UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINCOLNWAY COMMUNITY BANK, | ) |
| Plaintiff, | ) No. 11 C 5907 |
| v. | ) |
| | ) Judge Edmond E. Chang |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

# I. Introduction

Plaintiff LincolnWay Community Bank seeks a declaration that a life insurance policy it owns on Raymond Veselik is valid, or in the alternative, requests restitution of the premiums it paid if the policy is invalid.[1] At the close of discovery, Defendant Allianz Life Insurance Company filed this motion for partial summary judgment on the validity claim, arguing that the undisputed facts show that the Raymond Veselik policy is unlawful because it is a stranger-originated life insurance policy procured by a party who had no interest in the continuation of Raymond Veselik's life. For the following reasons, Allianz's motion for partial summary judgment is granted.

---

[1]The Court has subject matter jurisdiction over this case based on diversity jurisdiction under 28 U.S.C. § 1332.

## II. Background

For purposes of a summary judgment motion, the facts are viewed in the light most favorable to LincolnWay, the non-moving party, and all reasonable inferences are drawn in its favor.[2] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Scott Veselik was an independent insurance agent who sold life insurance for Allianz, among other companies. DSOF ¶ 3; R. 80-5, Exh. B, S. Veselik Dep. 20:3-26:22. William Passero was a real estate developer and Scott Veselik's neighbor, officemate, and social acquaintance. DSOF ¶ 3; R. 80-4; Exh. A, Passero Dep. 35:9-56:5. In the mid-2000s, Scott and Passero went into the life insurance business together as premium financiers, funding the initial premiums of insured parties. DSOF ¶ 4; S. Veselik Dep. 41:15-50:18; Passero Dep. 57:15-59:10. Scott and Passero themselves turned to a source for funding this business; in 2006, they met with George Alexenko, the Chief Credit Officer and Executive Vice President of LincolnWay Community Bank, to provide an overview on premium financing and the secondary life insurance market. DSOF ¶ 23; R. 80-6, Exh. C., Alexenko Dep. 146:2-149:18. During that meeting, Passero proposed using LincolnWay-funded loans to pay premiums on life insurance policies for a 26-month

---

[2]Citations to the docket are noted as "R." followed by the entry number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Allianz's Statement of Facts) [R. 79-1 (sealed), R. 80-2 (public)]; "PSOF" (for LincolnWay's Statement of Additional Facts) [R. 95 (sealed), R. 97 (public)]; "Pl.'s Resp. DSOF" (for LincolnWay's Response to Allianz's Statement of Facts) [R. 95 (sealed), R. 97 (public)]; "Def.'s Resp. PSOF" (for Allianz's Response to LincolnWay's Statement of Additional Facts) [R. 104-1 (sealed), R. 105-1 (public)]; and "Def.'s Reply to Pl.'s Resp. DSOF" (for Allianz's Reply to LincolnWay's Response to Allianz's Statement of Facts) [R. 104-2 (sealed), R. 105-2 (public)]. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

period. DSOF ¶ 24; Alexenko Dep. 176:4-177:16. This was the length of a policy's contestability period—the amount of time an insurance company generally has to challenge the policy's validity. DSOF ¶¶ 29-30; Alexenko Dep. 146:15-147:21. After the 26-month period, there were three "exit options" for the financier: (1) the insured could buy the policy back from the financier by repaying the loan; (2) the financier could sell the policy on the secondary market to recoup the premiums paid; or (3) the financier becomes the owner of the policy and either lets it lapse or continues paying the premiums. DSOF ¶ 25; S. Veselik Dep. 64:22-65:10, 90:21-91:11. Scott and Passero told Alexenko that they planned to "fill out applications [for potential insured parties] at insurance companies that didn't try to weed out policies that would ultimately be sold." DSOF ¶ 31; Alexenko Dep. 176:18-177:16. In particular, Allianz was one of "the last [insurance companies] to change [the application] to ask about where the premiums came from, was it financed, were there any talks of life settlements, and was someone else helping you provide the … funds for the policy." R. 95-3, Exh. A., S. Veselik Dep. (LincolnWay Excerpt – Sealed) 95:4-17. After Alexenko approved the plan, Passero and Scott coordinated the financing for at least eleven life insurance policies, including the Veselik Policy, using loans from LincolnWay. DSOF ¶ 47, R. 79-40, Exh. MM, Passero Financial Statement at LW000730; R. 79-4, S. Veselik Dep. (Sealed) 68:5-83:16.

In early 2008, Passero, Scott, and Alexenko discussed the specific loan to fund Raymond Veselik's policy. DSOF ¶ 75 (citing R. 1 at ¶¶ 8-9). Scott was Raymond Veselik's son. S. Veselik Dep. 70:18-19. But Passero had no insurable

3

interest in Raymond's life; the two were not related, had never lived in the same house, and had never owed each other any money. DSOF ¶ 80; Passero Dep. 208:2-209:18. In January 2008, Scott applied for an Allianz life insurance policy (the Policy or Veselik Policy) on the life of his father, Raymond Veselik, and listed his mother, Judith Veselik, as the beneficiary. DSOF ¶ 53; R. 79-15, Exh. N, Veselik Policy at LW000158-165. On March 14, 2008, LincolnWay sent a letter to Passero with loan documents and a check for $210,900 to fund the Veselik Policy premium. DSOF ¶ 63; R. 79-29, Exh. BB, 3/14/08 Letter. Shortly afterward, Scott wrote a personal check to Allianz for $210,900; Scott knew that the money from Passero and LincolnWay would be available before his check to Allianz cleared. DSOF ¶ 63; S. Veselik Dep. 112:1-12, 166:11-16. On March 17, 2008, Passero signed a document called "Assignment of Life Insurance Policy as Collateral" for the LincolnWay loan. DSOF ¶¶ 67-68; R. 79-9, Exh. H, 3/17/08 Assignment. This document stated that the Veselik Policy was "to be held as collateral security for any and all present and future liabilities of the above referenced Borrower, or any of them, to the Assignee, of every nature and kind, whether now existing or that may hereafter arise … ." 3/17/08 Assignment at LW000007. LincolnWay argues that this was not a formal assignment of the collateral but rather the rote completion of an automatically generated form. Alexenko Dep. 178:2-16; Pl.'s Resp. DSOF ¶¶ 67-68. The next day, on March 18, 2008, Allianz formally issued policy number ****8106, the Veselik Policy. DSOF ¶ 65, Veselik Policy at LW000148.

On December 29, 2008, just nine months after the Policy's issuance, Scott filed a request with Allianz to transfer the Policy to Passero, DSOF ¶ 72, R.79-56, Exh. 9, 12/29/08 Request, a change that Allianz confirmed on the following day, Pl.'s Resp. to DSOF ¶ 72; R. 95-8, Exh. F, 12/30/08 Letter. Passero later transferred the Veselik Policy to LincolnWay on August 31, 2010. DSOF ¶ 72; R. 79-14, Exh. M, 8/31/10 Letter. LincolnWay brought this action on August 25, 2011, seeking (1) a declaratory judgment that the Veselik Policy is valid and (2) if the Policy is not valid, then restitution of the premiums paid to Allianz. R. 1, Compl.; R. 20, Am. Compl. In September 2013, this Court denied Allianz's motion to dismiss, concluding that the Amended Complaint on its face did not establish that the Policy was an unenforceable stranger-originated life insurance scheme. R. 38. Discovery is now complete, and Allianz moves for partial summary judgment on LincolnWay's validity claim, arguing that the undisputed facts show that the Policy was procured by Passero, who had no insurable interest in Raymond Veselik's life, and is thus invalid under Illinois common law. R. 79.

### III. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable

inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### IV. Analysis

### 1. STOLIs and the "Insurable Interest" Requirement

The parties agree that Illinois law governs this diversity action. Illinois maintains the longstanding rule that "the procurer of an insurance policy on the life of another must have an insurable interest in the other's life." *Bajwa v. Metro. Life Ins. Co.*, 776 N.E.2d 609, 617 (Ill. App. Ct. 2002) (citing *Guardian Mutual Life Ins. Co. of N.Y. v. Hogan*, 80 Ill. 35, 39 (1875)). An insurable interest means "an interest in having the life [of the insured] continue," *Colgrove v. Lowe*, 175 N.E. 569, 571 (Ill. 1931) rather than an interest in the insured's early death, *Ohio Nat'l Life Assur. Corp. v. Davis*, — F.3d —, 2015 WL 6163138, at *3 (7th Cir. Oct. 20, 2015) (citing *Grigsby v. Russell*, 222 U.S. 149, 155 (1911)). This requirement stems from "the

6

unseemliness of gambling on when a person will die." *Ohio Nat'l*, 2015 WL 6163138 at *3. Life insurance purchased by an individual with no insurable interest is a wager on the insured's life. *See Bajwa*, 776 N.E.2d at 617. Now called stranger-originated life insurance (STOLI), these transactions have been prohibited by the Illinois common law for at least a century and a half and are considered illegal and void from their inception. *See Ohio Nat'l*, 2015 WL 6163138 at *5; *Ill. State Bar Ass'n Mut. Ins. v. Coregis Ins.*, 821 N.E.2d 706, 712 (Ill. App. Ct. 2004) ("[I]f the subject matter of a contract is illegal, that contract is void ab initio."). STOLI transactions are now also statutorily prohibited by the 2009 Viatical Settlements Act. 215 ILCS 159/1 *et seq*.[3]

The insurable-interest requirement, however, does not prohibit the legitimate, *post*-procurement transfer of a policy to someone without an interest in the continued life of the insured, "such as when an insured sells a policy on the open market as a means of liquefying the asset." *Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 824 (N.D. Ill. 2012). The Illinois Supreme Court approved those types of transfers in 1919, holding that there is "no reasonable basis for public policy forbidding the owner of the insurance policy to sell it and assign it to any one who would pay more than the cash surrender value which the company was willing to pay." *Hawley v. Aetna Life Ins. Co.*, 125 N.E. 707, 709 (Ill. 1919). An active secondary life insurance market—called the "life settlement" or "viatical

---

[3]Illinois common law applies to this case because the Viatical Settlements Act was enacted after the Veselik Policy was issued. Even though Allianz states that the Act codified the common law's prohibition on STOLI, R. 80-1, Def.'s Br. at 9, the parties have not briefed this issue nor argued that the Act applies retroactively, R. 96, Pl.'s Resp. at 6-7.

7

settlement" market—developed across the country in the 1980s during the AIDS crisis. *PHL Variable Ins. Co. v. Bank of Utah*, 780 F.3d 863, 865 (8th Cir. 2015) (citing Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, & Securitization*, 13 U. Pa. J. Bus. L. 173, 185-86 (2010)). An owner may wish to sell his policy on the secondary market because of "a desperate need for money; the policy may be his only substantial asset; and if he's elderly or in very poor health the present value of that asset may be substantial and he may have a pressing interest in being able to cash it in by selling the beneficial interest" or the policy itself. *Ohio Nat'l*, 2015 WL 6163138, at *3. Once sold, the policy belongs to an investor who collects the payouts when the insured dies. *Id.*

Although transfers to those without an insurable interest "do not always run afoul of state laws … they often do." *Penn Mut.*, 887 F. Supp. 2d at 824 (citation omitted). The key to legality, then, is that the policyholder must have an insurable interest in the insured's life at the *inception* of the policy; in contrast, it is impermissible to participate in an arrangement "solely to create the illusion of an insurable interest … to procure the policy for investors." *Penn Mut. Life Ins. Co. v. GreatBanc Trust Co.*, 2012 WL 2074789, at *3 (N.D. Ill. June 8, 2012). *See also Hawley*, 125 N.E. at 708 (there is a "difference between the cases in which the policy was procured by a person who had no insurable interest in the life of the person insured, thus making a wager contract, and the cases where a policy was procured in good faith by the person himself to be assigned thereafter"); *Ohio Nat'l*, 2015 WL 6163138, at *4 ("'cases in which a person having an interest lends himself to one

without any, as a cloak to what is, *in its inception*, a wager, have no similarity to those where an honest contract is sold in good faith' to a stranger.") (quoting *PHL*, 780 F.3d at 867-68). A policy is a STOLI and void if someone other than the "insured[s] owned and controlled the policy before attempting to sell it," meaning the "insureds were the defendants' puppets and the policies were bets by strangers on the insureds' longevity." *Ohio Nat'l*, 2015 WL 6163138, at *4.

### 2. The Veselik Policy

Allianz argues that the Veselik Policy is an invalid STOLI where a "speculator attempts to profit through financing the procurement of and effectively controlling a life insurance policy and either retaining it or selling it to other investors in a secondary market for a profit." R. 80-1, Def.'s Br. at 2-3. As the Court put it in a previous order, the relevant question is: "was Scott Veselik truly the one who procured the Policy?" R. 38 at 10. Or did Passero procure the Policy as an investment vehicle, using Raymond Veselik as a straw man? In making this determination, courts "should look beyond the mere form of the transactions in question and consider their substance." *Cisna v. Sheibley*, 88 Ill. App. 385, 394 (1899). Technical compliance with the insurable interest requirement is not dispositive, *id.*, so it is not enough by itself that Scott, who had an interest in the life of his father, signed the Policy application. *See Penn Mut.*, 2012 WL 2074789, at *4 (an investor may not use someone with an insurable interest "to disguise the true owner of the policy."). On the other hand, it is not dispositive that a third party—Passero, through LincolnWay—did not have an insurable interest in Raymond's life

9

but funded his life insurance premiums. This practice of premium financing is legal and regulated in Illinois. *See* 215 ILCS 5/513a2(c) ("'Premium finance agreement' means a promissory note, loan contract, or agreement by which an insured or prospective insured promises to pay to another person an amount advanced or to be advanced thereunder to an insurer in payment of premiums on an insurance contract … .") As another district court explained, "an insured's ability to procure a policy is not limited to paying the premiums with his own funds; borrowing money with an obligation to repay would also qualify as an insured procuring a policy." *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 869 F. Supp. 2d 556, 563 (D. Del. 2012).

Instead, the Court must look past form and consider the nature of the understanding between Passero and Scott at the Policy's inception, such as who had control over the Policy, whether there was a pre-existing agreement to transfer the Policy to Passero, and whether Scott intended to repay the premiums. *See Ohio Nat'l*, 2015 WL 6163138 at *4. In the recent *Ohio National* case, for example, the Seventh Circuit affirmed summary judgment in favor of the insurance company when a lawyer and insurance agent "targeted as nominal buyers individuals who they thought would have short life expectancies," such as the elderly, and persuaded them to apply for policies. 2015 WL 6163138 at *1. In return, the individuals received a small amount of money. *Id.* The insured parties assigned the policies' beneficial interests to the insurance agent's husband, who paid the initial premiums and then resold the interests to an investor. *Id.* at *2. This arrangement

was unlawful because "[t]he insureds merely lent their names to the insurance applications, in exchange for modest compensation, and the defendants forthwith transferred control over (effectively ownership of) the policies to themselves." *Id.* at *4. Critical to the case's holding was control: "The defendants, who had no interest in the insureds' lives (as distinct from their deaths), initiated, paid for, and controlled the policies from the outset." *Id.* And "[t]he insureds' family members … retained beneficial interests in the policies only briefly and never controlled the trusts. The insureds were the defendants' puppets and the policies were bets by strangers on the insureds' longevity." *Id.*

The arrangement here was not as glaring as the one in *Ohio National* but still establishes that the Veselik Policy is a STOLI. Passero, who had no interest in Raymond's life, was the true owner of the Policy at its inception because Passero had control over the Policy and expected the Policy to be transferred to him after its issuance. Def.'s Br. at 2. The evidence shows, even when viewed in LincolnWay's favor, that in the mid-2000s, Passero and Scott worked together to identify and finance life insurance policies for various acquaintances and family members, including Passero's mother, Scott's father, and Scott's father-in-law. S. Veselik Dep. (Sealed) 70:8-75:9. They knew that in the secondary life insurance market, "the older [the insured] the better." *Id.* 58:12-22. "[Scott] Veselik's plan … was that they would fill out the applications at insurance companies that didn't try to weed out policies that would ultimately be sold." Alexenko Dep. 177:2-10. In particular, Allianz was one of "the last [insurance companies] to change [the application] to ask

11

about where the premiums came from, was it financed, were there any talks of life settlements, and was someone else helping you provide the—you know, the funds for the policy." S. Veselik Dep. (LincolnWay Excerpt – Sealed) 95:4-17. Those are all features of a STOLI arrangement, where the default state of affairs from the start—if nothing more were to happen—is that the stranger would own the policy. On the front end, the insureds agreed to this plan because they got two years of free insurance. S. Veselik Dep. 75:20-76:4. Although some tried to buy the policies back (by repaying the loan) after the 26-month period, all parties ultimately transferred their policies to Passero. *Id.* 104:15-21; Passero Dep. 220:21-221:11.[4]

Passero and Scott also procured the Veselik Policy in this manner in 2008. Raymond had an underperforming insurance policy and relied on Scott to research alternatives. R. 95-6, Exh. D, R. Veselik Dep. (Sealed) 65:22-66:18. After a conversation with Scott, Raymond "was told that [Scott] was going to be the owner, and [his] wife was the beneficiary." *Id.* 49:13-17. Because his life circumstances were "crazy" at the time, Raymond did not pay much attention to the research or application process and left the details to Scott. *Id.* 70:18-71:2. Raymond, who had been an insurance agent since 1971, *id.* 16:20-17:1, had never seen the Policy until shortly before this litigation nor known the face amount. *Id.* 50:8-18. Although Raymond knew that Scott was going to pay the initial premiums, he did not know or ask about the source of the funds. *Id.* 51:6-21. Just nine months after Allianz

---

[4]This was a lucrative arrangement—Passero made money by selling the policies for more than he paid on the premiums. Passero Dep. 77:13-22. And Scott received over $1.2 million in commissions, approximately $190,000 of which was for the Veselik Policy. R. 79-51, Exh. 2 (sealed), Veselik Policy Commission; R. 79-49, Rice Decl. ¶ 56 (sealed)

12

formally issued the Veselik Policy on March 18, 2008, Veselik Policy at LW000148, Scott filed a request with Allianz to transfer the Policy to Passero on December 29, 2008, 12/29/08 Request. Like the other insureds whose premiums were financed by Passero, Scott and Raymond gave the Policy to Passero at the end of the two-year period. R. 97-3, S. Veselik Dep (LincolnWay Excerpt) 130:6-11. The stranger—Passero—planned to own the Policy via this transfer: "it was [Passero's] intention to have ownership transferred to him under some arrangement so that he could ultimately sell that policy after the two-year contestability period." Alexenko Dep. 264:1-7. Put another way, in substance—looking past the form—Passero was wagering that Raymond Veselik would live for 26 months, and then Passero would own the Policy. The reason Passero was not listed as the owner in the first place was because the application had to meet technical insurable interest requirements: he and Scott had explained to Alexenko that "when the insurance policy is originally obtained, it needs to be obtained by the insured, a beneficiary and an owner who had the appropriate relationship to the insured." *Id.* 263:13-264:7. And Scott never had the intention of repaying Passero—when asked what assurances Passero had of recouping the money, Scott responded: "[Passero] was hoping I couldn't pay him back and he could sell it for more." S. Veselik Dep. 115:17-116:2.[5]

Further, Passero's assignment of the Policy as collateral on March 17, 2008, and Alexenko's approval of this assignment, reflected their understanding that

---

[5]There does not appear to be evidence about whether Scott would have had any obligation to repay the $210,000 premium had Raymond passed away before nominal ownership transferred to Passero in December 2008. If not, this would be additional evidence that Scott was never on the hook for the initial premium payments and that Passero was the true owner.

13

Passero would later retain legal rights in the Policy. As of March 17, if Raymond or Scott really owned the Policy, then the security could not be perfected because Passero was not the actual owner of the Policy and Allianz did not know about the assignment. Alexenko Dep. 262:8-20; Pl.'s Resp. DSOF ¶ 13. This undermines characterizing the Policy as belonging to Raymond or Scott, because "the deal with Passero was that he would assign the policies to us as collateral." *Id.* 180:1-9. LincolnWay's loan policies required loan collateral to be "readily marketable" and "capable of being assigned and/or a security interest perfected." R. 79-43, Exh. PP, Loan Policies at LW001323. Indeed, Alexenko explained that there were *no* "circumstances under which LincolnWay would accept as collateral for a loan property the borrower does not own and where Lincolnway has not obtained some kind of assurance from the owner of that property[.]" Alexenko Dep. 195:6-12. Yet Alexenko was comfortable with the situation because he knew that Passero would eventually perfect the security interest by becoming the owner and alerting Allianz of the assignment. *Id.* 262:13:20. Passero waited until January 2009, after he became the formal owner of the Policy, to notify Allianz about the assignment. R. 79-57, Exh. 10, 1/15/09 Letter. That Passero and Scott chose Allianz, whose application did not ask questions about financing and did not try to weed out policies designed to be sold, also shows that Passero delayed notifying Allianz in order to avoid arousing Allianz's suspicions that the Policy was a STOLI. Alexenko Dep. 177:2-10, S. Veselik Dep. (LincolnWay Excerpt – Sealed) 95:4-17.

### 3. LincolnWay's Arguments

LincolnWay advances four arguments to preclude summary judgment: (1) Scott's attempts to sell the Policy at the end of the 26-month period contradict a pre-existing arrangement to transfer; (2) there is a factual dispute over the circumstances of the March 17, 2008 assignment; (3) the circumstances surrounding Raymond Veselik's need for additional insurance coverage shows that the Policy was legitimate; and (4) there is a factual dispute about Passero's ownership status.

LincolnWay argues that there is a genuine dispute about the existence of a pre-existing agreement because Scott later attempted, but failed to come up with, the money to repay the loan. R. 96, Pl.'s Resp. 10-11; S. Veselik Dep. (LincolnWay Excerpt) 130:5-14. The relevant point of time, however, is *the Policy's inception*, and the parties' intent at that time, not two years later. For example, if there was an original agreement to transfer a policy back to the investor, but the insured party later changed his mind, broke the agreement, and kept the policy, this would still be a STOLI arrangement because the parties agreed to the transfer at the time of issuance. At that moment, the investor was making a wager on the life of the insured because the investor arranged for the eventual ownership of the policy. Furthermore, even if Scott's actions at the end of the two-year period were evidence of intent at the time of the Policy's inception, the undisputed evidence still shows that the default agreement was that the Policy would be transferred to Passero *unless* Scott or Raymond could come up with the money to pay back the $210,900 loan. In other words, even though Scott and Raymond theoretically had this option

15

at the end of the two-year period, no one expected it to be a realistic possibility—it was form over substance. Scott's efforts to repay the loan only involved "ma[king] a few calls." S. Veselik Dep. (LincolnWay Excerpt) 130:12-14. As for Raymond—he did not even know that there was a loan to repay. R. Veselik Dep. 55:11-17. Passero "was hoping [Scott] couldn't pay him back and [Passero] could sell it for more." S. Veselik Dep. 115:17-116:6. In fact, "Bill [Passero] and [Scott] Veselik in the initial meeting [with Alexenko] described that Bill would try to gain control of the policies in order to sell them for a profit." R. 95-5, Alexenko Dep. (Sealed) 207:11-16. That is, Passero understood that "[o]wnership would be transferred to him." *Id.* 207:17-20. And "[Passero] would gain control [of] as many of [the policies] as he could." *Id.* 207:21-208:6. Indeed, all of the other insured parties had handed over their policies to Passero. Passero Dep. 220:21-221:11; S. Veselik Dep. 104:18-21. In these circumstances, a reasonable jury could only conclude that Passero was making a wager on Raymond's life.

LincolnWay also argues that the March 17, 2008 collateral assignment does not prove Passero's ownership of the Policy because the assignment paperwork was a formality as a result of a "computer form automatically generated at the inception of loans by the same software that generated the other loan documents." Pl.'s Resp. at 8; Alexenko Dep. 178:2-16. And "LincolnWay understood the Collateral Assignment would not be effective unless and until Passero actually became the owner of the Policy and the Collateral Assignment was accepted by the insurance company." *Id.* But this does not preclude summary judgment because the key

16

question is the understanding between Passero and Alexenko at the policy's inception. Alexenko knew that the Policy would ultimately be transferred to Passero, who would file the assignment paperwork with Allianz as soon as he received formal ownership of the Policy. Alexenko Dep. 262:8-20. Even though Alexenko did not know precisely when Passero would file the assignment with Allianz, Alexenko knew it was inevitable because "that's what was necessary to perfect the lien." *Id.* Given that LincolnWay's practice was to accept *only* collateral owned by the borrower and capable of being perfected, Alexenko Dep. 195:6-12, it makes sense that "[Passero] was getting the screws put to him at the bank" and that LincolnWay "required [Passero] to change the ownership into his name" as soon as possible. S. Veselik Dep. 178:12-179:7. Thus, the facts show an understanding between Passero and Alexenko that Passero controlled the Policy at inception and that Passero's formal ownership was certain to occur.

LincolnWay also argues that Raymond had a legitimate desire for additional policy coverage and designated his wife as the beneficiary, so the transaction was not a sham. Pl.'s Resp. 9-12. Allianz does not dispute that Raymond's prior life insurance policy was underperforming or that Raymond had a son getting married, two sons getting divorced, and a wife with worsening health. R. Veselik Dep. (Sealed) 60:11-24. But Raymond's legitimate desire for coverage does not prevent the Policy from being a STOLI—in fact, the typical STOLI scheme attracts potential insureds "through the promise of two years of free life insurance." *Carton v. B & B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1239 (D. Nev. 2011) (citing 3 Leo

Martinez et al., New Appleman Insurance Law Practice Guide § 34.09[3] (2011)) (explaining that "[i]f the insured dies within the two-year contestability period, the speculator is repaid plus interest out of the proceeds of the policy."). Nor does Raymond's need for coverage contradict the evidence that Passero and Scott had a pre-existing arrangement to transfer the Policy to Passero. On the contrary, Raymond's (lack of) involvement in the insurance process actually shows that it was Scott and Passero who came up with the idea for the Policy and controlled it. Even though Raymond was an experienced life insurance agent, he was not involved in researching replacement insurance policies, did not know how Scott would pay the premium, and had never seen the Policy or known its face amount until shortly before the litigation. R. Veselik Dep. (Sealed) 16:20-17:1, 50:8-18, 51:6-21.

Finally, LincolnWay suggests that there is a genuine dispute as to Passero's ownership status at the Policy's inception because Passero testified that he did not recall if he was the owner at the time. R. 105, Def.'s Reply 11; Pl.'s Resp. at 7; Pl.'s Resp. Def.'s DSOF ¶ 16; Passero Dep. 63:8-11. But in certain circumstances— including this one—"[a] statement of 'I don't recall,' suggests a 'mere possibility' of a dispute, which not does satisfy the requirements of Rule 56." *Hammel v. Eau Galle Cheese Factory*, 2003 WL 21067091, at *12 (W.D. Wis. Apr. 15, 2003) (citing *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983)). To be sure, there are circumstances where a witness's lack of memory could create a genuine issue of fact, because the circumstances dictate interpreting (or at least allowing a reasonable jury to interpret) the "I don't recall" statement as the equivalent of "I don't believe

that happened." But here, given all of the other evidence of Passero's control over the Policy at its inception, Passero's failure to remember is not affirmative evidence that he *was not* the owner at the time of inception. *See Rodriguez v. Kane Cnty. Sheriff's Merit Comm'n*, 2012 WL 280360, at *5 (N.D. Ill. Jan. 31, 2012) (citing *Chicago United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 853 (7th Cir. 2012)). In view of the evidence showing that Passero controlled the Veselik Policy at its inception and that there was an agreement that it would be transferred, a reasonable factfinder could only find that the Policy is an invalid STOLI because Passero had no insurable interest in Raymond's life.[6]

## V. Conclusion

For the reasons discussed above, Allianz's motion for partial summary judgment on the validity claim, R. 79, is granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 6, 2015

---

[6]*Ohio National* suggests that when there is a void STOLI contract, courts leave the parties as they are without requiring the insurance company to return the premiums paid. *Ohio Nat'l*, 2015 WL 6163138, at *6-7 ("Generally when an illegal contract is voided, the parties will be left where they have placed themselves with no recovery of the money paid for illegal services.") (citation and quotations omitted). The exception is when "the party that made the payments is not to blame for the illegality." *Id.* (citation omitted). LincolnWay's unjust enrichment claim is not currently before the Court, but the parties are encouraged to engage in settlement discussions given *Ohio National's* recent guidance on this claim.